AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   2:20-MJ-04079 |
| 25329 VIA SALUDO, VALENCIA, CALIFORNIA 91355 | ) ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 471, 1343, and 912 | Conspiracy, counterfeiting obligations, wire fraud, impersonating employee of the U.S. |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s Garret Sumpter
_____
*Applicant's signature*

Special Agent Garret Sumpter, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA_____

Hon. Alexander F. MacKinnon, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA Andrew Brown, x0102, 11th Floor

## ATTACHMENT A

PREMISES TO BE SEARCHED

The location to be searched is **25329 VIA SALUDO, VALENCIA,
CALIFORNIA 91355** ("MONTALBAN'S RESIDENCE").  The residence is a
single-story, single-family home with a steep-angled roof
located on VIA SALUDO north of Via Barra.  The residence is gray
in color, with white siding, a white garage door, and a red
front door.  The number "25329" appears above the garage door in
black.  The premises to be searched includes the entire lot as
well as vehicles parked on it that are controlled or owned by
Edgardo MONTALBAN.  Two photographs of MONTALBAN'S RESIDENCE
follow:



**ATTACHMENT B**

**I.  ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 471 (Counterfeiting/Forging-Obligations or Securities of the United States), 1343 (Fraud by Wire), and 912 (False Personation-Officer or Employee of the United States) (the "Subject Offenses"), namely:

a.    Records, programs, and items referring or relating to "Suppressed IRS Accounts," government grants for businesses, the claimed need for additional funds to expedite the processing of applications, or victims Richard Cabrera, Anabella Carolino, Julita Fraley, Smyrna Dojcinovic, Yolanda Pamintuan, Arturo Pamintuan, Reynoldo Santos, Ms. Lopez, Ms. Sanchez, and Nadia Nikolaev, whether referred to by first or last name or both;

b.    Records, programs, and items referring or relating to telephone number 916-975-3591, or address 2640 Steiner St, San Francisco, California 94115;

c.    Records, programs, and items referring or relating to blank check stock, or U.S. Treasury checks, including their security features;

d.    Records, programs, and items relating to the counterfeiting or manipulation of negotiable instruments, documents, or identifications, such as the cutting-and-pasting

iii

or alteration of signatures, letterheads, watermarks, security features, dollar values, and seals, including the altered or counterfeited information itself;

      e.  Credit and debit cards and accounts not in the names of the residents of the residence, or owner of the vehicle, being searched, including related documents and records such as receipts or invoices;

      f.  Mail matter and shipping packages, opened or unopened, not addressed to or from the residence being searched;

      g.  Personal identifying information of individuals other than those residing at the residence or owner of the vehicle, being searched, including social security numbers, other identifying numbers, dates of birth, addresses and telephone numbers, credit, gift, debit card, or other account information, PINs, credit reports, and bank or other financial institution information, and records referring or relating to such information;

      h.  Records relating to wealth and the movement of wealth since January 2013, such as crypto-currency accounts and transfers, other digital wealth storage and transfer methods including PayPal and Venmo, money orders, brokerage and financial institution statements, wire transfers, currency exchanges, deposit slips, cashier's checks, transactions involving prepaid cards, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, real estate mortgage initial purchase loans or loan refinances, residential property leases, escrow accounts,

the purchase, sale, or leasing of automobiles or real estate, or
auto loans, and investments, or showing or referring to
purchases or transactions for more than $1,000;

     i.   Records or items containing indicia of occupancy,
residency or ownership of any location or vehicle being
searched, such as keys, rental agreements, leases, utility
bills, identity documents, cancelled mail, and surveillance
video;

     j.   Currency, money orders, and casino chips with a
value in excess of $1,000, including the first $1,000 if more
than $1,000 is found, precious metal coins and bullion, Bitcoin
and other digital currency as well as related documents and
programs, and prepaid debit or credit cards;

     k.   Documents and keys relating to public storage
units, safety deposit boxes, Commercial Mail Receiving Agencies,
virtual offices, or receiving mail at someone else's address, or
holding or renting assets or items under someone else's name;

     l.   Documents and records showing electronic and
telephone contacts and numbers called or calling, such as SIM
cards, address books, call histories, telephone bills, and
WhatsApp, Telegram, and email addresses.

     m.   Documents and records referring or relating to
law enforcement or bank investigations, accounts being frozen or
closed or at risk of the same, currency transaction reports, and
manipulating transaction amounts to avoid scrutiny;

n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

2.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the attachment of other devices;

d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.   evidence of the times the device was used;

f.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

g.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and

manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

       h.   records of or information about Internet Protocol
addresses used by the device;

       i.   records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

     3.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

     4.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to

store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

5.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to

determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team will not search for similar evidence outside the scope of the items to be seized without first obtaining authority to do so.

        d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

        f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

7.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

x

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

8.    During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumbs and/or fingers of EDGARDO MONTALBAN and LAVORIA PIERCE onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of face of EDGARDO MONTALBAN and LAVORIA PIERCE with their eyes open to

activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

9.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant, and do not apply to any other search of digital devices.

## I.    AFFIDAVIT

I, Garret Sumpter, being duly sworn, declare and state as follows:

## II.    PURPOSE OF AFFIDAVIT: SEARCH WARRANTS

1.    This affidavit is made in support of an application for warrants to search the residences and vehicle of EDGARDO MONTALBAN and LAVORIA, aka "Layoma," RUFUS PIERCE, namely 25329 VIA SALUDO, VALENCIA, CALIFORNIA 91355 ("MONTALBAN'S RESIDENCE"), 11922 WEDDINGTON ST., APARTMENT 208, VALLEY VILLAGE, CALIFORNIA 91607 ("PIERCE'S APARTMENT"), and the 2016 BLUE KIA SORENTO bearing California license plate number 8SGG066 and Vehicle Identification Number (VIN) 5XYPG4A39GG027180 ("PIERCE'S KIA"), as further described in Attachments A, for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 371 (Conspiracy), 471 (Counterfeiting/Forging-Obligations or Securities of the United States), 1343 (Fraud by Wire), and 912 (False Personation-Officer or Employee of the United States) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

## III. INTRODUCTION

2.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since September 15, 2019. I received my initial training and instruction to become a Special Agent during the 21-week-long course at the FBI Academy located in Quantico, Virginia. During my training at the FBI Academy, I received extensive training in a variety of

investigative and legal matters, including the topics of Fourth
Amendment searches, the drafting of search warrant affidavits,
and probable cause.

3.    After initial training, I was assigned to the
Lancaster Resident Agency, Los Angeles Field Office.  I
currently work a variety of criminal and national security
matters, to include white-collar crimes.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrant.
It does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

## IV.   SUMMARY OF PROBABLE CAUSE

5.    On or between 2013 to the present, Edgardo MONTALBAN
who holds himself out as an accountant and tax preparer, enticed
several of his clients to invest in a non-existent federal grant
program he called "Suppressed IRS Accounts."  Under the
purported grant program, MONTALBAN directed his clients to
identify dormant companies that they owned and to pay him the
amount of any outstanding taxes owed for each company.
MONTALBAN claimed that once the outstanding taxes were settled
with the State of California, the grant application would
proceed with the federal government, and eventually pay the

2

grantees millions of dollars for each dormant company.
MONTALBAN claimed to have high-level contacts working in the
Internal Revenue Service (IRS) that could push the grants
through.  A review of toll records belonging to MONTALBAN
revealed that Lavoria Rufus PIERCE purported to be an employee
of the IRS who could assist MONTALBAN's clients obtain a special
IRS grant worth millions.  MONTALBAN used counterfeit U.S.
Treasury checks made out under the clients' names as props to
entice the clients.  MONTALBAN frequently came up with excuses
as to why his IRS contacts required additional funds for
expenses such as private plane, hotel, and other incidentals.
MONTALBAN required his clients pay in cash and keep the grant
program a secret.  The total victim losses in this grant scheme
is estimated to be approximately $5 million.

## V.   EARLIER WARRANT FOR TRACKING THE TELEPHONES OF MONTALBAN AND PIERCE

6.   On August 21, 2020, the Honorable Alexander F.
MacKinnon issued a warrant authorizing the tracking of the
telephones of MONTALBAN and PIERCE, 20-3969M, based on an
earlier version of this affidavit.  The affidavit below is
essentially identical, but contains more evidence regarding the
residences and vehicle of MONTALBAN and PIERCE.

## VI.   STATEMENT OF PROBABLE CAUSE

### A.   MONTALBAN Took About $5 Million in Cash from Victims for the Purported "Suppressed IRS Accounts" Grants with PIERCE's Help

7.   In early 2020, Richard Cabrera submitted an online tip
to the Federal Bureau of Investigation (FBI) National Threat

Operations Center.  FBI Special Agent (SA) David Garcia and I conducted several interviews with Cabrera and his domestic partner, Annabella Carolino, both telephonically and in person. During the interviews, Cabrera and Carolino stated the following:

     a.  In 2018, Edgardo Zeta MONTALBAN, an accountant residing in Valencia, California, offered a federal grant program by the name of "Suppressed IRS Accounts" to Cabrera and Carolino.  Under the grant program, MONTALBAN directed Cabrera and Carolino to identify dormant companies that they owned and pay him the amount of any outstanding taxes owed for each company.  MONTALBAN claimed that once the outstanding taxes were settled with the State of California, the grant application would proceed with the federal government and eventually pay the grantees millions of dollars for each dormant company.  Cabrera and Carolino estimated that they had lost approximately $1.2 to $1.5 million collectively to MONTALBAN's grant scheme from approximately 2018 to May 2020.

     b.  MONTALBAN claimed to have high-level contacts working in the Internal Revenue Service (IRS) that could push the grants through.  On several occasions, both Cabrera and Carolino spoke telephonically with "Lowella" (apparently LAVORIA RUFUS PIERCE, as described later).  "Lowella" purported to be the head of the Oakland IRS field office.  On at least one occasion, while speaking telephonically, "Lowella" asked Carolino for additional funds so that she could pay for a

private plane, hotel, and other incidentals for the government
official who was authorized to sign the grant checks.

      c.  Cabrera and Carolino provided **661-644-6549** as the
telephone number used by MONTALBAN ("MONTALBAN'S TELEPHONE").
Carolino and Cabrera also helped Agents identify additional
victims involved in MONTALBAN's scheme.

    8.  SA Garcia and I conducted two victim interviews with
Julita Fraley, who estimated that she lost approximately
$400,000 to $500,000 to MONTALBAN's grant scheme from
approximately August 2018 to June 2020.  Fraley stated that she
had spoken telephonically with a third party whom MONTALBAN
introduced as "Lowella."  MONTALBAN informed Fraley that
"Lowella" was an official with the IRS.  MONTALBAN showed Fraley
a U.S. Treasury check worth $53.65 million.

    9.  SA Garcia and I conducted a victim interview with
Smyrna Dojcinovic, who estimated that she lost approximately
$600,000 to MONTALBAN's grant scheme from approximately 2017 to
January 2020.  Dojcinovic provided MONTALBAN'S TELEPHONE as the
number she used to contact MONTALBAN.  Dojcinovic stated that
she had spoken telephonically with a third party whom MONTALBAN
introduced as "Lowella," and claimed that she was employed by
the IRS and was in charge of tax examiners.  MONTALBAN showed
Dojcinovic a U.S. Treasury check worth $632,000; Dojcinovic
provided a copy of the U.S. Treasury to SA Garcia.

**Victims Identify PIERCE as "Lowella," Purported IRS Insider**

    10.  SA Garcia and I conducted a victim interview with
Yolanda ("Yolly") Pamintuan and her spouse Arturo ("Art")

5

Pamintuan, who estimated that they lost approximately $1 million to MONTALBAN's grant scheme from approximately 2013 to 2015. Yolly and Art Pamintuan stated that they had spoken telephonically with a third party whom MONTALBAN introduced as "Lowella," a contact that worked at the IRS. Yolly and Art Pamintuan stated that they had seen MONTALBAN and "Lowella" together at several social gatherings. Yolly and Art Pamintuan both recognized PIERCE's Department of Motor Vehicle (DMV) photograph to be "Lowella."

11. All six victims interviewed by Agents stated that they recognized MONTALBAN when shown his DMV photograph. To date, copies of six different counterfeit U.S. Treasury checks made out to several victims had been turned over to the investigating Agents. Through interviews conducted with victims, Agents believe that three other possible victims, to include Reynoldo Santos, Ms. Santos, and Ms. Lopez, may exist with a further combined loss of approximately $2 million on or between 2017 to the present. Additionally, U.S. Secret Service (USSS) Agents interviewed Nadia Nikolaeva who stated she lost approximately $20,000 to MONTALBAN's scheme.

   **B.   Toll Records Show MONTALBAN Called PIERCE When He Wanted to Convince Cabrera that "Lowella" at the IRS Was Working on the Purported Grants**

12. In November 2019, Cabrera and Carolino met with MONTALBAN in person. During the meeting, Cabrera asked MONTALBAN to speak with his IRS contact. Cabrera observed MONTALBAN dial an unknown number and switch the phone to speakerphone mode. "Lowella" answered and claimed to be an

employee of the IRS who could assist Cabrera and Carolino in
obtaining a special IRS grant worth millions.  During the same
meeting, MONTALBAN displayed several U.S. Treasury checks under
the names of Cabrera and Carolino.  The check for Cabrera was
made out for $40 million while the check to Carolino was made
out for $65.565 million.  Cabrera took two photographs of the
U.S. Treasury checks.

13.  Cabrera provided SA Garcia with the photographs of the
U.S. Treasury checks during the previous meeting with MONTALBAN,
to include the metadata captured by the cellular telephone.
Cabrera observed that the date and time stamps of the
photographs on his cellular telephone were November 14, 2019 at
3:57 p.m. and 3:58 p.m. (PST).  Cabrera estimated that MONTALBAN
had called "Lowella" within an hour period of when the
photographs were taken.

14.  SA Garcia and I reviewed MONTALBAN'S TELEPHONE toll
records from November 14, 2019, from approximately 2:57 p.m. to
4:57 p.m. (PST).  At 3:00 p.m., MONTALBAN'S TELEPHONE contacted
the known cellular telephone of Carolino; the call lasted less
than one minute.  At 4:13 p.m., MONTALBAN'S TELEPHONE contacted
916-975-3591 ("UNSUB TELEPHONE"); the call lasted approximately
13 minutes.  At 4:46 p.m., MONTALBAN'S TELEPHONE contacted **818-
810-8380** (PIERCE'S TELEPHONE); the call lasted less than one
minute.

a.  An ACCURINT query showed **818-810-8380** is a Metro
PCS cellular phone registered to "Layoma" R. PIERCE ("PIERCE'S
TELEPHONE") at PIERCE'S APARTMENT (discussed later).

7

       i.   A subsequent National Crime Information Center (NCIC) check of PIERCE revealed that she had previously been arrested by the Unified Police Department of Greater Salt Lake on fraud-impersonation charges.  The NCIC check also revealed that PIERCE had previously been arrested by the USSS on bank fraud charges.

       b.   Subscriber information shows that UNSUB TELEPHONE is an AT&T prepaid cellular phone with a listed address of 2640 Steiner St, San Francisco, California 94115, which is the same address used in the 1993 movie "Mrs. Doubtfire."  UNSUB TELEPHONE was active from approximately August 2019 to May 2020. Because, as described below, UNSUB TELEPHONE had contacts with both PIERCE'S TELEPHONE and MONTALBAN'S TELEPHONE and is an untraceable "burner" phone, it appears that it may have been used as a "fraud" phone by PIERCE, who likely wanted to keep the telephone that is registered to her using her alias first name "Layoma" (PIERCE'S TELEPHONE) more removed from the scheme:

       i.   Between September 2019 to February 2020, UNSUB TELEPHONE contacted or attempted to contact MONTALBANS'S TELEPHONE a number of times.

       ii.   Between September 2019 to February 2020, UNSUB TELEPHONE contacted or attempted to contact PIERCE'S TELEPHONE several times.

       iii. On at least one occasion between September 2019 to February 2020, UNSUB TELEPHONE contacted the cellular telephone of victim Dojcinovic.

### C.   Consensual Monitored Phone Conversations of MONTALBAN and PIERCE

15.   SA Garcia and I conducted consensual monitoring recordings of two separate victims ("VICTIM 1" and "VICTIM 2"), who called MONTALBAN:

a.   On May 15, 2020, VICTIM 1 called MONTALBAN on MONTALBAN'S TELEPHONE.  The conversation between VICTIM 1 and MONTALBAN occurred in English and Tagalog.  MONTALBAN told VICTIM 1 that "Lowella" did not have the results yet and he would call back in several days with an update.  MONTALBAN stated that "Lowella" was trying to contact another examiner who had VICTIM 1's check.  MONTALBAN stated that the check would be mailed to VICTIM 1.

b.   On June 9, 2020, VICTIM 2 called MONTALBAN on MONTALBAN'S TELEPHONE.  The conversation between VICTIM 2 and MONTALBAN occurred in English and Tagalog.  MONTALBAN told VICTIM 2 that he could not get in contact with "Lowella" because they were not completely opened yet (presumably due to COVID-19).  MONTALBAN stated that he would let VICTIM 2 know when he had an update.  During the conversation, MONTALBAN mentioned the Morongo Casino was opening.

16.   From approximately July 29, 2020 to August 14, 2020, SA Garcia and I conducted consensual monitoring recordings of two separate confidential human sources ("CHS 1" and "CHS 2").

a.   CHS 1 made initial contact with MONTALBAN on MONTALBAN'S TELEPHONE.  MONTALBAN and CHS 1 spoke telephonically on approximately seven different occasions.  On most occasions,

9

MONTALBAN did not answer the initial call on MONTALBAN'S TELEPHONE and called CHS 1 back within several minutes from a private number. On at least one occasion, MONTALBAN abruptly ended the call and called CHS 1 back on a private number before further discussing the details of his scheme. MONTALBAN told CHS 1 that he could resolve their tax problems for $60,000.

       i.   On August 4, 2020, after placing a telephone call to MONTALBAN'S TELEPHONE, CHS 1 received a telephone call from a "private number." CHS 1 answered the telephone call and was greeted by MONTALBAN. MONTALBAN stated he had just finished work for the Franchise Tax Board and had an upcoming appointment with the IRS to get quotes to take care of CHS 1's tax debt owed to the IRS. MONTALBAN stated that it would take three to four months before the whole process was completed and that by December, CHS 1 would have a zero balance on the debt owed to the IRS. MONTALBAN further stated that CHS 1 would not have to worry about the Franchise Tax Board because both the IRS and the Franchise Tax Board go hand-in-hand and he would be able to take care of both.

       ii.   On August 5, 2020, CHS 1 called MONTALBAN'S TELEPHONE. MONTALBAN asked CHS 1 to send him the completed Power of Attorney form that he had previously provided CHS 1. MONTALBAN provided CHS 1 with his bank account information and advised CHS 1 that he would call his bank to notify them he would be expecting an incoming wire transfer of $60,000. MONTALBAN stated that he was meeting with his IRS contact on the

following day and that his IRS contact would call CHS 1 the following day.

        iii. On August 6, 2020 at approximately 2:18 p.m., CHS 1 received a telephone call from a "private number." CHS 1 answered the telephone call and was greeted by MONTALBAN. CHS 1 advised MONTALBAN that their bank account had been frozen. MONTALBAN stated that he had spoken to his IRS contact earlier in the day and that they had already started working on CHS 1's case.  MONTALBAN stated that he could have one of the IRS officer's, Lowella Smith, call CHS 1.

      b.   On August 6, 2020 at approximately 3:14 p.m., CHS 1 received a telephone call from a "private number."  The voice on the telephone introduced herself as Lowella Smith and stated that she had received CHS 1's telephone number from MONTALBAN.

        i.   CHS 1 asked Smith if she worked for the IRS and Smith stated that she did.  Smith stated that she had been working with MONTALBAN for several years and that he had been helping those who had different tax situations alleviate a lot of their debt.

        ii.   CHS 1 asked Smith if she was going to help with their IRS debt.  Smith stated that based on the type of debt owed and the time frame it was due, there was always something that can be done.  Smith advised CHS 1 that she had spoken to MONTALBAN and that the $60,000 quoted fee would take care of the debt and other fees that would be involved in fast tracking everything.

       iii.  CHS 1 stated that their bank account was frozen and that CHS 1 would need to use a retirement account to provide the $60,000 fee.  Smith stated that she would be able to help CHS with the debt and that CHS 1 would need to provide all the paperwork involved.  CHS 1 asked what Smith could do to assist CHS with the frozen bank account.  Smith advised CHS 1 to call the bank and find out who froze the account and what amount was frozen.  Smith stated that the amount was still there but that there was a block on the account.

       iv.  Smith stated that she wanted to see how soon CHS 1 wanted to get something done and restated that the fee would be $60,000 to get everything started. Smith advised CHS 1 that usually when the IRS places a lien on a bank account that there would normally be some documentation.

       c.  On August 14, 2020, CHS 2 made a ruse "wrong number" call to PIERCE'S TELEPHONE to get a voice exemplar.  A female voice answered the call.  CHS 2 asked to speak to "Mary." The female voice advised CHS 2 that CHS 2 had the wrong number. CHS 2 then asked if she was sure because CHS 2 was using a new telephone and the number dialed was Mary's number.  The female voice stated that CHS 2 must have not had Mary's number for years.  CHS 2 thanked the female voice and terminated the telephone call.  As described below, this voice exemplar appears to match that of "Lowella."

**D. MONTALBAN'S TELEPHONE and PIERCE'S TELEPHONE Communicated With Each Other Several Times After MONTALBAN Called the New Potential "Victim" CHS 1**

17. SA Garcia and I reviewed MONTALBAN'S TELEPHONE toll records from August 6, 2020, from approximately 1:00 p.m. to 3:59 p.m. (PST). Following MONTALBAN'S TELEPHONE outgoing call to CHS 1's telephone, MONTALBAN'S TELEPHONE and PIERCE'S TELEPHONE contacted each other several times.

**PIERCE'S TELEPHONE Called New Potential "Victim" CHS 1 Directly**

18. SA Garcia and I reviewed toll records from the telephone that CHS 1 used to communicate with MONTALBAN's TELEPHONE. According to the toll records, PIERCE's TELEPHONE contacted the telephone that CHS 1 was using on August 6, 2020 at approximately 3:14 p.m. (PST), the same time SA Garcia recorded the incoming call with CHS 1. The call lasted approximately seven minutes.

**The Voice that Answered PIERCE'S TELEPHONE Matches "Lowella's"**

19. SA Garcia compared the audio file from the August 6, 2020 consensually recorded telephone call between CHS 1 and a person who purported to be "Lowella Smith" with that for the August 14, 2020, ruse "wrong number" to PIERCE'S TELEPHONE, and concluded that they appear to be the same person.

**E. MONTALBAN Resides at MONTALBAN'S RESIDENCE**

20. Records from the DMV listed MONTALBAN's address as 25329 VIA SALUDO, VALENCIA, CALIFORNIA 91355 ("MONTALBAN'S RESIDENCE"). Additionally, Accurint telephone query results for 661-644-6549 (MONTALBAN'S TELEPHONE) listed MONTALBAN's address as 25329 VIA SALUDO, VALENCIA, CALIFORNIA 91355.

21.   Cabrera and Carolino both stated that they had met MONTALBAN at MONTALBAN'S RESIDENCE on multiple occasions. During separate interviews, Agents presented photographs of 25329 VIA SALUDO, VALENCIA, CALIFORNIA 91355 to Cabrera and Carolino who both recognized it as MONTALBAN'S RESIDENCE.

22.   On April 27, 2020, SA Garcia conducted a spot-check surveillance at the MONTALBAN'S RESIDENCE.  A 2011 black Toyota Prius bearing California license plate number 6XUR970, was parked in front of the residence.  A check of the DMV database revealed that the registered owner of this vehicle returns to Bryan Montalban (presumably MONTALBAN'S son) and Mia Montalban (presumably MONTALBAN'S daughter-in-law), with a listed residence at 29129 Singing Wood Drive, Santa Clarita, California 91390.

23.   On June 12, 2020, SA Garcia and I conducted a trash cover at MONTALBAN'S RESIDENCE.  Agents recovered the contents of two trash bins which contained the following:

a.   One billing statement from Physicians Immunodiagnostics Laboratory addressed to Edgardo Z. Montalban, 25329 VIA SALUDO, VALENCIA, CALIFORNIA 91355;

b.   One letter dated on Jun 6, 2020 and addressed to Asurian-Claims Dept. requesting a check payable to Edgardo Z. Montalban for the replacement of phone associated with telephone number 661-644-6549 (MONTALBAN'S TELEPHONE);

c.   One IRS Form 8879 dated on April 2, 2020 and containing taxpayer names of Bryan E. Montalban and Mia Montalban.

**F.    PIERCE Resides at PIERCE'S APARTMENT**

24.  On May 20, 2020, SA Garcia conducted a check of the CLEAR database for PIERCE'S name and observed that the most current address listed for PIERCE was 11922 WEDDINGTON ST., 208, NORTH HOLLYWOOD, CALIFORNIA 91607 (PIERCE'S APARTMENT).

25.  On May 21, 2020, SA Garcia conducted a check of the ACCURINT database for PIERCE'S TELEPHONE and observed that the current address listed for a "Layoma" R. PIERCE was 11922 WEDDINGTON ST., 208, VALLEY VILLAGE, CALIFORNIA 91607 (PIERCE'S APARTMENT).

26.  On May 25, 2020, SA Garcia conducted a check of the California DMV database for PIERCE'S driver's license information and observed that PIERCE'S driver's license listed a mailing address of 11922 WEDDINGTON ST., 208, VALLEY VILLAGE, CALIFORNIA 91607.

27.  On August 1, 2020, I conducted a spot-check surveillance at 11922 WEDDINGTON ST, VALLEY VILLAGE, CALIFORNIA 91607.  A BLUE KIA SORENTO bearing California license plate number 8SGG066 (PIERCE'S KIA) was parked in front of the building.  A check of the DMV database revealed that the registered owner of this vehicle, a 2016 model with VIN 5XYPG4A39GG027180, returns to PIERCE, with a listed address of 11922 WEDDINGTON ST, 208, VALLEY VILLAGE, CALIFORNIA 91607.  The registration for this vehicle is currently valid from April 20, 2020 to April 20, 2021.

28.  On August 6, 2020, SA Garcia made contact with SA Eve Williams with the United States Postal Inspection Service and

inquired as to whether PIERCE was receiving mail at 11922
WEDDINGTON ST, 208, VALLEY VILLAGE, CALIFORNIA 91607.  SA
Williams confirmed to SA Garcia that PIERCE was in fact
receiving mail at PIERCE'S APARTMENT.

### VII. TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES

29.  Based on my training and experience, I know that
persons engaged in counterfeiting typically retain evidence of
such activity on their computers, cellular telephones, or other
forms of electronic storage media for long periods of time.
Such individuals often use cellular telephones to communicate
about their business plan, and their crimes by making telephone
calls, sending text messages and e-mails, and posting on social
media.

30.  In addition, many criminals who manufacture
counterfeit products today are able to do so with a standard
computer, scanner and color inkjet or multi-function printer.
Because such equipment is highly valuable and difficult to move,
counterfeit manufacturers tend to keep their equipment in the
same location for long periods of time.

31.  Some criminals involved with offenses that require
equipment or voluminous documents rent public storage units to
store incriminating evidence safely, but away from themselves.
Successful criminals often attempt to store their ill-gotten
gains in compact and hard to trace means, such as digital
currency, precious metals, casino chips, prepaid debit or
"credit" cards, and cash.  The more cagey ones may rent safety
deposit boxes to store this wealth.

16

32.   In my training and experience, criminals who have accomplices must communicate with them, which they typically do by telephone, email, text, or communication application such as WhatsApp that encrypts their messages.  Accordingly, they need to maintain contact details for their accomplices, which they commonly store on their smart phones.  Typically, they maintain these smart phones where they themselves are, commonly in their residences, automobiles, or on their persons.

### VIII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

33.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

17

used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.  The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.  Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    34.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data

18

during a search of the premises for a number of reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    35.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

          b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

          c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress the thumb and/or fingers of EDGARDO
MONTALBAN and LAVORIA PIERCE on the device(s); and (2) hold the
device(s) in front of the faces of EDGARDO MONTALBAN and LAVORIA
PIERCE with their eyes open to activate the facial-, iris-,
and/or retina-recognition feature.

     36.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## IX.  <u>CONCLUSION</u>

37.  For the reasons described above, I respectfully submit there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of the violations of the Subject Offenses described above, will be found at MONTALBAN'S RESIDENCE, PIERCE'S APARTMENT, and PIERCE'S KIA as further described in Attachments A of this affidavit.


Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this _____ day of August,
2020.


_____
UNITED STATES MAGISTRATE JUDGE